## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT CONDON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-06-2193 |
| | § | |
| WOOD GROUP LOGGING SERVICES, | § | |
| INC. d/b/a WOOD GROUP | § | |
| PRODUCTION TECHNOLOGY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

Robert Condon sued his former employer, the Wood Group Logging Services, Inc. d/b/a Wood Group Production Technology ("Wood Group"), alleging that he was fired because of national origin discrimination and that he was subjected to a hostile work environment.  Condon alleges violations of Title VII, 42 U.S.C. § 2000e *et seq.*, and asserts a state-law claim for intentional infliction of emotional distress.  The Wood Group has moved for summary judgment on all claims, (Docket Entry No. 18), Condon has responded, (Docket Entry No. 19), and the Wood Group has replied, (Docket Entry No. 22).  Based on a careful review of the motion, response, and reply; the pleadings; the record; and the applicable law, this court grants the Wood Group's summary judgment motion and enters final judgment by  separate order.  The reasons for this decision are set out below.

## I.      Background

Condon is an engineer.  Before he began working for the Wood Group, he worked for three years at Pemex, Mexico's national petroleum exploration company.  The Wood Group is a subsidiary of an international energy services company headquartered in Aberdeen, Scotland and Houston, Texas.  The Wood Group began in Scotland and has a number of Scottish-born employees.  Condon alleges that he was discriminated against and ultimately fired because he was American, not Scottish.

On May 4, 2004, the Wood Group's Production Technology Unit hired Condon to work as a Sales Engineer in its Houston office.  (Docket Entry No. 18, Ex. B at 18, 23). David Blacklaw, the General Manager of the Production Technology unit, interviewed Condon and recommended that he be hired.  (Docket Entry No. 18, Ex. C at ¶ 3).  Blacklaw is Scottish.   The Operations Manager for the U.S. Production Technology unit, Roy Torrance—also a Scot—accepted Blacklaw's recommendation to hire Condon.

Condon's responsibilities included developing and marketing downhole permanent monitoring systems.  Condon was instructed to focus primarily on marketing this product to Pemex.  Blacklaw stated in his deposition and affidavit that he made the recommendation to hire Condon as a Sales Engineer because he was fluent in Spanish and had previously worked for Pemex.  (Docket Entry No. 18, Ex. B at 22–23; Ex. C at ¶ 3).  Condon was the third Sales Engineer to work at Protech.  Dale Scott is Scottish; Tom Taylor is American. Both spent a considerable amount of time at the Houston office.

Shortly after Condon was hired, Torrance resigned.  Blacklaw became the interim Operations Manager in June 2004 and stayed in that position until July 2005.  Colin McKay, the Technology Manager, then became the Operations Manager and reported to Blacklaw. Blacklaw directly supervised Condon until July 2005, when McKay became Condon's direct supervisor.  McKay is Scottish.

Condon testified in his deposition that he believed he was discriminated against and subjected to harassment because he was not Scottish.  Condon asserts that he heard "derogatory, Pro-Scottish statements" by Scottish employees, including McKay; that Condon was not invited to eat lunch with his peers; that he was held to higher standards than one of the Scottish sales engineer employees; and that he had to move out of his office into an area without adequate work space to make room for a new project engineer.  (Docket Entry No. 18, Ex. B at 35, 65, 69, 72–76, 109).  Condon alleges that when he was fired on September 2, 2005, it was not because of the reasons proffered—problems with Condon's performance—but because of discrimination on the basis of his national origin.

The record shows that Condon spent the first few months on the job familiarizing himself with the Wood Group's downhole monitoring systems.  He then focused his efforts on marketing the systems to Pemex.  Blacklaw testified that after Condon began this work, deficiencies in his job performance became evident.  (Docket Entry No. 18, Ex. A at 26–27; Ex. C at ¶ 4).  In his declaration and his deposition, Blacklaw testified that Condon did not regularly update him on negotiations or progress with the Pemex account, despite the fact that such reports were part of his regular job duties as a Sales Engineer.  (Docket Entry No.

3

18, Ex. C at ¶ 5).   Condon had difficulty putting together tenders and bids and communicating projected costs using the systems and processes that the Wood Group had developed.  In January 2005, Blacklaw met with Condon to tell him that his performance was deficient.  A written performance evaluation dated January 21, 2005 described Condon's overall performance as a level 3 out of 5, which was "fully satisfactory" but below "very good" and "outstanding." The evaluation stated that "[c]ommunication issues have detracted from Robert's job satisfaction and effectiveness."  (Docket Entry No. 18, Ex. B–2 at 2).  The evaluation stated that Condon had "not realized his potential as yet" and that a "number of communication failures have been identified" between Blacklaw and Condon.  Blacklaw stated in the evaluation that he found it hard to get Condon to communicate "clearly or logically" and that the Wood Group was not getting the "best return" from Condon's abilities and efforts.  (*Id.* at 5).  Blacklaw testified that Condon became upset during the discussion and left the meeting.  (Docket Entry No. 18, Ex. C at ¶ 5).

Blacklaw testified that he saw no improvement in Condon's work after the January 2005 evaluation.  Condon continued having difficulty preparing bids and projecting costs and had to get help from Scott and Taylor.  Blacklaw noted other problems with Condon's work as well.  Condon did not complete bids in a timely manner and Scott or Taylor had to finish the work.  Condon did not give Blacklaw a clear understanding of the terms and conditions that Pemex included in the contract negotiations, which was critical.  Condon did not follow Blacklaw's instructions on how to perform a cost analysis critical to the Pemex project.  His finished analysis contained fundamental errors.  Blacklaw testified that the other Sales

4

Engineers completed similar projects in considerably less time.  (Docket Entry No. 18, Ex. C, at ¶ 7–8).  Condon also had arguments with other employees and threatened to quit on multiple occasions.  Condon argued with a female employee about the Pemex account and sent an email to Blacklaw threatening to quit if  that employee was not fired.  (Docket Entry No. 18, Ex. B-3).  In the summer of 2005, Condon told most of the Houston office that he was thinking about quitting.  (Docket Entry No. 18, Ex. B at 68).

In July 2005, Colin McKay became the Operations Manager and Condon reported directly to McKay.  Like Blackwell, McKay had problems with Condon's work performance.  McKay met with Condon to try to help him improve his communication skills and the quality of his work, but saw no improvement.  (Docket Entry No. 18, Ex. C at ¶ 10).

In late summer 2005, Blacklaw and McKay talked about the problems with Condon's work and the time spent trying to improve his performance.  Blacklaw and McKay decided to discharge Condon because he lacked the experience and abilities necessary for the position.  (*Id.* at ¶ 11).  Blackwell testified that the problems that led to the decision were his "communication, his overall performance, his attitude or approach to the position, his failure to comply with the systems and processes and tools that we'd established to operate the business, and his failure to achieve agreed deliverables . . . within reasonable time frames, [and] preparation of tenders, bids . . . ."  (Docket Entry No. 18, Ex. A at 26–27; Ex. A–4).  Blacklaw testified that he or McKay raised these issues with Condon before, in, and after his January 2005 performance evaluation.  (Docket Entry No. 18, Ex. A at 28).  Condon's employment was terminated on September 2, 2005, with the approval of Blacklaw's direct

manager, John Paul Jones, a Scot.  The other Sales Engineers, one of whom was an American like Condon, continued to work for the Wood Group.

Condon admitted that he received a negative performance appraisal in January 2005 and that he was counseled about problems with his work after that.  (Docket Entry No. 18, Ex. B at 41–42, 46, 49).  Condon disagreed with some of the criticisms of his work and with the reasons for admitted problems.  Condon did not believe that he had communication problems.  He denied becoming angry and leaving his performance review.  (Docket Entry No. 18, Ex. B at 46).  Condon acknowledged that he had problems with preparing cost analyses, but blamed a new template used for cost analysis as the cause of his difficulties. He denied needing assistance in preparing proposals or projecting costs.  He also testified that he had a firm understanding of the terms and conditions involved in the contract being negotiated with Pemex.  (Docket Entry No. 18, Ex. B at 88).

Condon asserted that the criticisms he received about his work were a pretext for discrimination on the basis of his national origin.  Condon pointed to a statement by McKay in January 2005, made in a group, that "if you ain't Scottish, you ain't shit."  (Docket Entry No. 19, Ex. A at 73–74).  Condon asserted that this phrase and other pro-Scottish remarks were also made in his presence by his coworkers.  (Docket Entry No. 18, Ex. B at 68–69). Condon alleged that he was excluded socially because he was not routinely invited to eat lunch with his coworkers.  (Docket Entry No. 19 at 4).  He also alleged that he was held to a higher standard than the Scottish Sales Engineer, who came to work late and unkempt but was not reprimanded.  (*Id.*).  Condon testified that he had to move out of his office and into

a small one without adequate work space to make room for a new project engineer.  (*Id.*).

Condon alleged that he was fired because he was not Scottish, rather than because of his job

performance, and seeks damages for emotional distress.  The Wood Group moves for

summary judgment.  The motion and Condon's response are addressed below.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  The movant

bears the burden of identifying those portions of the record it believes demonstrate the

absence of a genuine issue of material fact.  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347,

349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986)).

If the burden of proof lies with the nonmoving party, the movant may either (1) submit

evidentiary documents that negate the existence of some material element of the opponent's

claim or defense, or (2) if the crucial issue is one on which the opponent will bear the

ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently

supports the essential element or claim.  *Celotex*, 477 U.S. at 330.  While the party moving

for summary judgment must demonstrate the absence of a genuine issue of material fact, it

does not need to negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp.

Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could

affect the outcome of the action."  *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir.

2005) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  If the moving party

fails to meet its initial burden, the motion for summary judgment must be denied, regardless

7

of the nonmovant's response.  *Baton Rouge Oil & Chem. Workers Union v. Exxon Mobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004).  This burden is not satisfied by "some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

## III.   The National Origin Discrimination Claim

### A.    The Legal Standard under Title VII

Under Title VII, it is "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national

origin . . . ."  42 U.S.C. § 2000e-2(a)(1).  The inquiry under Title VII is "whether the defendant intentionally discriminated against the plaintiff."  *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004).

When a plaintiff presents proof of alleged discrimination through indirect or circumstantial evidence, the claim is considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), recently modified in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004).  Under the modified *McDonnell Douglas* approach, the plaintiff has the initial burden of making a *prima facie* showing of national origin discrimination.  *Abarca v. Metropolitan Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005); *Rachid*, 376 F.3d at 312.  A plaintiff satisfies this burden by showing that: (1) he is a member of a protected group; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) after he was discharged, he was replaced with a person who is not a member of the protected class. *Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003); *Okoye v. Univ. of Tex. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001).  The fourth prong may also be met if a plaintiff shows that he was "treated differently from others similarly situated." *Abarca*, 404 F.3d at 941.

If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment decision. *Cullwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006).  If a defendant can produce such evidence, the presumption of discrimination dissolves. *Reeves v. Sanderson Plumbing*

9

*Prods., Inc.*, 530 U.S. 133, 142–43 (2000); *Price v. Fed. Express Corp.*, 283 F.3d 715, 720

(5th Cir. 2002).  The plaintiff must then offer evidence to create a fact issue "either (1) that

the defendant's reason is not true, but is instead a pretext for discrimination (pretext

alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its

conduct, and another motivating factor is the plaintiff's protected characteristic

(mixed-motives alternative)."  *Rachid*, 376 F.3d at 312 (internal quotation and alteration

marks omitted); *see also Cullwell*, 468 F.3d at 873; *Keelan v. Majesco Software, Inc.*, 407

F.3d 332, 341 (5th Cir. 2005) (analyzing a Title VII claim under the modified approach).

A plaintiff may show pretext by showing that the proffered reasons for the challenged

employment action are false or "unworthy of credence," *Laxton v. Gap Inc.*, 333 F.3d 572,

578 (5th Cir. 2003).  Pretext may be shown by any evidence that demonstrates that the

employer's proffered reason is false.  *See, e.g., Gee v. Principi*, 289 F.3d 342, 347–48 (5th

Cir. 2002) (an employer's inconsistent explanations for its employment decisions at different

times permits a jury to infer that the employer's proffered reasons are pretextual).  As the

Supreme Court explained in *Reeves v. Sanderson Plumbing Products, Inc.*:

> The trier of fact can reasonably infer from the falsity of the
> explanation that the employer is dissembling to cover up a
> discriminatory purpose. Such an inference is consistent with the
> general principle of evidence law that the factfinder is entitled
> to consider a party's dishonesty about a material fact as
> affirmative evidence of guilt.

530 U.S. at 147 (citations and internal quotation marks omitted).  The *Reeves* Court went on

to state that there may be rare instances in which a showing of pretext is insufficient to

sustain a jury's finding on discrimination, such as when: (1) "the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision", or (2) the plaintiff creates "only a weak issue of fact as to whether the employer's reason was untrue, and there [is] abundant uncontroverted evidence that no discrimination [has] occurred." *Id.* at 148.

In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus. *Rachid*, 376 F.3d at 312. The plaintiff has the ultimate burden of showing a genuine issue of material fact on whether the defendant discriminated against him on the basis of the plaintiff's membership in the protected class. *Reeves*, 530 U.S. at 143.

### B.   Analysis

The Wood Group argues that Condon has not made a *prima facie* showing of national origin discrimination. The Wood Group argues that Condon is unable to show that he was treated differently from others similarly situated. The Wood Group does not contest that Condon belonged to a protected class—non-Scottish employees—or that when he was hired Condon was viewed as qualified for the Sales Engineer position. The Wood Group does not dispute that Condon suffered an adverse employment action when he was fired, but disputes whether the other actions Condon alleges—such as not being invited to lunch and having to move out of his office—are actionable because they are not "adverse employment actions." *See Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) ("[A]n adverse

11

employment action consists of ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." (citations and quotations omitted)).  In the Fifth Circuit, plaintiffs must establish an adverse ultimate employment decision to prevail on their discrimination claims.  *Pryor v. Wolfe*, 196 F. App'x. 260, 262–63 (5th Cir. 2006) (holding that the "materially adverse" standard from *Burlington Northern and Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 2409 (2006), only applies to Title VII retaliation claims, and plaintiffs must still establish an adverse "ultimate employment decision" to prevail on their Title VII discrimination claims).  In the Fifth Circuit, only "ultimate employment decisions" such as "hiring, granting leave, discharging, promoting, and compensation" are actionable "adverse employment actions" for purposes of Title VII discrimination claims.  *Id.*  The only "ultimate employment decision" that Condon has alleged is his termination.  Even if not actionable, however, the other  incidents and events Condon asserts as discrimination are analyzed to determine whether they evidence discrimination in the termination decision.

In Title VII discriminatory treatment cases, the plaintiff "must first establish, by a preponderance of the evidence, a 'prima facie' case of . . . discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).  Because Condon was not replaced, (Docket Entry No. 18, Ex. C at ¶ 11), he must show that "similarly situated employees outside the protected class were treated more favorably."  *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005) (citations omitted).  Condon asserts that both Taylor and Scott, the other two Sales Engineers, have low production levels but were not discharged.  When Condon was fired, however, the

12

two other Sales Engineers remained in their jobs, including the other American.  Condon has

not alleged or presented competent summary judgment evidence that any similarly situated

employees who were Scottish were treated more favorably.  Additionally, the absence of sales

was only one of the reasons given for the decision to fire Condon.  There is no information

in the record to suggest that other Sales Engineers had similar employment deficiencies,

received a negative performance evaluation and multiple counseling sessions, continued to

demonstrate deficient performance, yet were allowed to keep their jobs.

The only other evidence of disparate treatment Condon offers is that Dale Scott, the

Scottish Sales Engineer in the Houston office, came to work late, unshaven, and unkempt.

(Docket Entry No. 19, Ex. A at 35).  The record does not show that Scott had the same

deficiencies in his job performance that Condon was criticized for having.  None of the

criticism Condon received concerned tardiness or grooming.  Nor does the record show

whether Scott was reprimanded for any aspect of his job performance.

Even assuming that Condon has shown a *prima facie* case, the Wood Group has

provided a legitimate, nondiscriminatory reason for the adverse employment

decision—Condon's  poor job performance—and Condon has not raised a fact issue as to

either pretext or motivating factor.  To raise a fact issue as to discrimination, Condon "must

point to disputed facts from which a reasonable fact finder could conclude either that the

alternative reason is a pretext or that it was only one of multiple reasons for defendant's

conduct, another of which was [discriminatory] animus."  *Culwell*, 468 F.3d at 873 (citations

omitted).  The record contains ample evidence of the basis for the Wood Group's decision to

13

fire Condon.  In Condon's termination report, written performance evaluation, and testimony

by Blacklaw and McKay, the Wood Group presents evidence of Condon's inability to perform

the routine tasks his job required, the amount of time he took to perform his work, the

inaccuracies in that work, and the communication problems he had with management.

Blacklaw and McKay both complained to Condon that he did not provide information on the

status of his work and negotiations on a regular basis and did not provide clear or

understandable information.  (Docket Entry No. 18, Ex. 3 at ¶ 5).  Both McKay and Blacklaw

complained to Condon that he was not putting together tenders and bids properly using the

Wood Group's processes and methods for projecting costs.  The Wood Group points to

Condon's difficulties on the Pemex project, including his inability to relay a clear

understanding of the proposed standard contract terms and conditions and his inability to

complete cost analyses and projections in an accurate and timely manner.  The Wood Group

presented evidence that Condon failed to use the template Blacklaw instructed him to use to

complete the cost analysis and projection on the Pemex project.  The Wood Group presented

evidence that Condon's attitude also factored into his dismissal.  Condon argued with

coworkers and threatened to quit unless one coworker was fired.  (Docket Entry No. 18, Ex.

B–4).

The Wood Group presented undisputed evidence that Condon was formally warned

about the problems in his performance months before he was fired and counseled by both

McKay and Blacklaw several times after that, but did not exhibit improvement.  Condon does

not dispute the evidence of the evaluation and the counseling sessions.  He acknowledges that

14

he was criticized for his performance.  Condon acknowledges that there were some problems in his performance, but attributes those problems to the tools and processes his employer provided.  (Docket Entry No. 18, Ex. B at 41–42).  Condon disputes some of the other criticisms he received, but his subjective opinion as to his own performance does not raise a fact issue as to whether his employer's poor evaluation was a pretext or evidence of discrimination.  *See Roberson*, 373 F.3d at 654 (stating subjective belief "insufficient to create an inference of . . . discriminatory intent.").  Conclusory statements about Condon's belief in the high quality of his work are not competent evidence that can defeat summary judgment. *See Turner v. Baylor Richardson Med. Ctr.* 476 F.3d 337, 343 (5th Cir. 2007); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  Instead, Condon must offer specific evidence refuting the factual allegations underlying the proffered reasons for his  termination.

As noted, Condon has not presented competent summary judgment evidence that he was subjected to harsher employment standards than similarly situated Scottish employees. The only evidence he identifies is that one of the other two Sales Engineers, who was Scottish, came to work late and was poorly groomed, yet not reprimanded or fired.  Condon does not present evidence that another Scottish employee performed with the same number and kinds of deficiencies that the Wood Group told Condon were present in his work.

Condon also asserts that he was routinely not invited to eat lunch with his peers.  The record shows that such exclusion did not correlate to national origin.  American Tom Taylor, Condon's fellow Sales Engineer, spent several times a week in the Houston office and was invited to join other employees for lunch.  (Docket Entry No. 18, Ex. D at ¶ 3).

15

Condon also claims that he was not provided adequate work space.  In Plaintiff's Response to Defendant's Motion for Summary Judgment, Condon alleges he was "made to move out of his office and into a tiny desk without adequate work space in order to make room for a new project manager."  (Docket Entry No. 19 at 4).  There is no competent evidence to support this allegation.  Condon cites to pages 65 and 109 of his deposition, but these pages are not attached to Plaintiff's Response to Defendant's Motion for Summary Judgment or otherwise submitted as evidence.  Allegations and attorney arguments without supporting evidence are not sufficient to preclude summary judgment.  *See, e.g., Burdine*, 450 U.S. at 256 n.9 ("An articulation not admitted into evidence will not suffice.  Thus, the defendant cannot meet its burden merely through an answer or complaint or by argument of counsel.").

Condon argues that a derogatory, pro-Scottish remark by his supervisor, Colin McKay, is evidence of discriminatory animus.  "[S]o long as remarks are not the only evidence of pretext, they are probative of discriminatory intent."  *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 577 (5th Cir. 2003).  In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 152 (2000), the Supreme Court cautioned that a court should not exclude or discount "potentially damning" workplace comments merely because they "were not made in the direct context of [plaintiff's] termination."  Since *Reeves*, the Fifth Circuit has varied its approach for determining when "remarks" in the workplace are "stray" or are probative of discrimination.  *See Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 404–05 (5th Cir. 2001) ("[I]n light of the Supreme Court's admonition in *Reeves*, our pre-*Reeves* jurisprudence

16

regarding so-called 'stray remarks' must be viewed cautiously.").  Some decisions analyze the probative value of derogatory remarks according to the extent to which the remarks (1) were related to the protected class of persons of which the plaintiff is a member; (2) were proximate in time to the employment decision at issue; (3) were made by an individual with authority over the employment decision at issue; and (4) were related to the employment decision at issue.  *See, e.g., Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 343-44 (5th Cir. 2002) (quoting *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 2002)); *Auguster*, 249 F.3d at 405 (same); *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 222 (5th Cir. 2001) (same).  Other Fifth Circuit cases state that the appropriately "cautious" post-*Reeves* test is that derogatory statements can constitute evidence of discrimination even when they are not in the direct context of the termination and even if made by one other than the formal decisionmaker, as long as the speaker is in a position to influence the decision. *Palasota*, 342 F.3d at 578; *Laxton v. Gap, Inc.*, 333 F.3d 572, 583 (5th Cir. 2003); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002).  A remark may be so deficient under one or more of these criteria—for example, remote in time from the challenged action or not made by one with any involvement in or influence on the decision—as to be a "stray remark" wholly lacking in probative value even as indirect evidence of discrimination.  *See, e.g.*, *Palasota*, 342 F.3d at 578*; Patel*, 298 F.3d at 343–44; *Auguster*, 249 F.3d at 404–05; *Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 256 (5th Cir. 1999); *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 329-30 (5th Cir. 1998); *Waggoner v. City of Garland*, 987 F.2d 1160, 1166 (5th Cir. 1993).

McKay's comment was not made close to the employment decision at issue.  McKay allegedly made the remark in January 2005, nine months before Condon was fired and six months before McKay became Condon's supervisor.  The remark did not relate to a challenged employment decision.   McKay made the remark in the presence of four others, including three non-Scottish employees, after a successful presentation.  (Docket Entry No. 18, Ex. 2 at 74–75).  McKay's comments were in response to a remark made by Condon himself.  In his deposition, Condon was asked to describe the context in which McKay made the comment.  Condon testified that another non-Scottish employee "said something like I was Mr. Wood Group Mexico.  And I joked back, said, 'No, because my last name is not "McCondon."'"  (Docket Entry No. 18, Ex. B at 74–75).  McKay's comment is not probative of pretext or of discriminating motive.  *See Keelan*, 407 F.3d at 345–46 (a plaintiff may not "create a fact issue on pretext" by introducing evidence of stray remarks not connected to an employment decision).

Condon also alleges that project engineers, warehouse personnel, and service people made discriminatory remarks about non-Scots.  (Docket Entry No. 19, Ex. A at 72–76).  The comments allegedly made by Condon's coworkers are "stray remarks" insufficient to raise a fact issue as to national-origin discrimination.  The evidence does not show that such remarks related to Condon's termination.  There is no evidence that such remarks were made by employees with any authority to make the decision to fire Condon.  *See Nichols v. Loral*

18

*Vought Sys. Corp.*, 81 F.3d 38, 41–42 (5th Cir. 1996) ("To be probative, allegedly discriminatory statements must be made by the relevant decision maker.").

Condon has provided no evidence to support an inference that the reasons given for his termination were pretextual or that his national origin was a factor in his termination.[1]  The Wood Group's summary judgment is granted as to the discrimination claim.

## IV.   The Hostile Work Environment Claim

### A.   The Legal Standard

To survive summary judgment on his hostile work environment claim, Condon must show that: (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) the harassment affected a term or condition of her employment; and (5) that the Wood Group knew or should have known about the harassment and failed to take prompt remedial action.  *See Long v. Eastfield Coll.*, 88 F.3d 300, 309 (5th Cir. 1996).  A court uses a totality-of-the-circumstances test that focuses on "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating . . . and whether it unreasonably interferes with an employee's work performance."  *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

---

[1]  The Wood Group also argues that the "same actor" inference applies.  The "same actor" inference arises when the plaintiff is hired and discharged by the same employee and creates an inference that discrimination was not the reason for termination.  *See Brown*, 82 F.3d at 658 ("Claims that employer animus exists in termination but not in hiring seem irrational.  From the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." (citations, quotation marks, and brackets omitted)).  Wood Group provides evidence that  Blacklaw interviewed and recommended that Condon be hired and later approved the decision to fire him.  The inference strengthens the finding that Condon failed to provide evidence to raise a fact issue as to discrimination.

Although "[d]iscriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive" to support evidence of a Title VII violation, *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995) (citation omitted), "simple teasing, offhand comments, and isolated incidents, (unless extremely serious) will not amount to discriminatory charges" that can survive summary judgment.  *Hockman v. Westward Commc'n, LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (citation omitted).

### B.    Analysis

Condon points to the evidence of  derogatory, pro-Scottish remarks made to and in front of him, his exclusion from lunch gatherings, and the small office he was consigned to, as evidence to support his hostile work environment claim.  Condon again points to evidence that McKay made a pro-Scottish remark in front of Condon and other employees, and that other Scottish employees would also say,"if you ain't Scottish, you ain't shit."  (Docket Entry No. 19, Ex. A at 73).  This evidence does not raise a fact issue as to whether Condon suffered a hostile work environment.

In his deposition, Condon testified that he found none of these comments offensive.  Responding to questions about pro-Scottish remarks, Condon testified:

> Q.  Were there ever any comments to you about your national origin?
>
> A.  Maybe jokingly, but I never did take them as an insult or as an offense or as any [sic] racial.
>
> . . . .

Q.  Did you ever hear any comments about anyone's national origin or being non-Scottish that offended you?

A.  Not that offended me.  Everybody has a right to think what they may.

(Docket Entry No. 19, Ex. A. at 72–75).  There is no summary judgment evidence that indicates Condon was ever offended by any such remarks.  Derogatory remarks are not actionable unless they are subjectively as well as objectively offensive.  *See Harris*, 510 U.S. at 21–22 ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.).  Further, these comments pale in comparison, both in severity and frequency, to those found in the cases denying summary judgment on hostile work environment claims.  *See Walker,* 214 F.3d at 619–22 (holding that plaintiff survives summary judgment where evidence demonstrated years of inflammatory racial epithets); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 182 (4th Cir. 2001) (reversing summary judgment where plaintiff suffered "incessant racial slurs"); *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1266–67 (7th Cir. 1991) (finding summary judgment for defendant inappropriate where plaintiff was subjected to objectively and subjectively offensive racial jokes for a ten-year period and whose workstation was adorned with "a human-sized dummy with a black head").

Condon also points to evidence that he was not included in lunches and that he was not given adequate workspace.  As noted, the evidence shows that the other American Sales Engineer was included in the lunch gatherings.  There is no basis to support an inference that Condon's absence was linked to the fact that he was American.  There is no competent

21

evidence of the small office.  Even if such evidence was in the record, the evidence of

exclusion from lunches, working in a small space, seeing a Scottish Sales Engineer arrive late

and unkempt, and hearing remarks derogatory towards non-Scots, does not show sufficiently

severe or pervasive harassment as to establish a fact issue as to a hostile work environment.

*See Turner*, 476 F.3d at 348 (holding that supervisor's infrequent and isolated comments

directed to the plaintiff about "ghetto children" and other racially insensitive remarks did not

rise to the level of severe or pervasive); *and Septimus v. Univ. of Houston*, 399 F.3d 601, 612

(5th Cir. 2005) (holding that a supervisor's two-hour "harangue" and use of a mocking tone

and another supervisor's comment comparing the plaintiff to a "needy old girlfriend" did not

amount to a severe or pervasive working environment).

Condon's hostile work environment claim fails as a matter of law.[2]  Summary judgment

is granted as to this claim.

## V.    The Intentional Infliction of Emotional Distress Claim

The Wood Group moves for summary judgment on Condon's claim that his termination

caused emotional distress.  Under Texas law, the tort of intentional infliction of emotional

distress requires that Condon show that (1) the Wood Group acted intentionally or recklessly,

(2) the conduct was extreme and outrageous, (3) the Wood Group's actions caused Condon

---

[2]  Wood Group also argues that the national origin harassment claim is barred because it is not specifically addressed in the EEOC charge.  "A Title VII cause of action may be based upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination."  *Fine v. GAF Chem. Corp.*, 995 F.2d 576 (5th 1993) (citation omitted).  Because Condon's harassment claim fails on the merits, the court does not address this issue.

emotional distress, and (4) the resulting emotional distress was severe.  *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 740–41 (Tex. 2003); *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993).  To be extreme and outrageous, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Twyman*, 855 S.W.2d at 621.  A claim for intentional infliction of emotional distress does not lie for "ordinary employment disputes."  *Tex. State Farm Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 611 (Tex. 2002).  "Only in the most unusual of circumstances is conduct so extreme and outrageous that it is removed from the realm of ordinary employment disputes."  *Canchola*, 121 S.W.3d at 740–41.  Even if wrongful, the "termination of an employee does not, standing alone, constitute intentional infliction of emotional distress."  *City of Midland v. O'Bryant*, 18 S.W.3d 209, 217 (Tex. 2000).

Condon alleges that the Wood Group inflicted emotional distress on him by terminating him because of his national origin and by exposing him to unfavorable treatment and disparaging remarks about non-Scots.  The summary judgment evidence does not raise a fact issue as to extreme and outrageous conduct by the Wood Group.  Condon's intentional infliction of emotional distress claim fails, as a matter of law.  Summary judgment is granted as to this claim.

## VI.    Conclusion

The Wood Group's summary judgment motion is granted.  Final judgment will be entered by separate order.

SIGNED on August 14, 2007, at Houston, Texas.

Lee H. Rosenthal
United States District Judge